IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


EAGLE FUELS, LLC,                    )
                                     )
                Plaintiff,           )
                                     )
v.                                   )        Case No. 10-00811-CV-W-SWH
                                     )
RAY A. PERRIN, et al.,               )
                                     )
                Defendants.          )


ORDER

I.  BACKGROUND

At issue in this court tried lawsuit is the proper interpretation of two contracts entered

into between Eagle Fuels, LLC, and Ray Perrin, d/b/a Millennium Super Stop, LLC, as well as

the separate issue of whether Asif Kiayani and two of his companies, 786 Enterprises, Inc. and

Rawal Rock, Inc., tortiously interfered with the contractual relationship between Eagle Fuels,

LLC, and Ray Perrin d/b/a Millennium Super Stop, LLC.  The parties tried the case to the Court

from September 10 through 12, 2013.[1]

By contracts dated April 30, 2010, Eagle Fuels, LLC, entered into two Retailer Product

Sales Agreements with Ray A. Perrin, d/b/a Millennium Super Stop, LLC.  (Pl. Ex. 25 and 26)

One contract pertained to a convenience store operated under the name of Millennium Super

Stop (MSS) located at 3801 East Truman Road in Kansas City, Missouri.  (Pl. Ex. 25, Ex. A)

The other contract related to a convenience store operated under the name of Millennium Super

_____

[1]Following the trial, the parties asked for an extension of time to file proposed findings of fact
and conclusions of law pending briefing and a court ruling on defendants' motion for relief from
proceedings and for judgment pursuant to Fed. R. Civ. P. 17 and 54.  Following the denial of this
motion, the parties filed proposed findings of fact and conclusions of law on March 7, 2014.

Stop II (MSSII) located at 1601-1603 West 12th Street, Kansas City, Missouri.  (Pl. Ex. 26, Ex. A)  The terms of the agreements were identical except for the names and locations of the two stores and were entered into for the purpose of Eagle Fuels (the Seller) supplying Conoco/Phillips[2] branded fuel products to Ray Perrin, d/b/a MSS, LLC (the Buyer) for a ten-year period with an option for an additional five years at the discretion of Eagle Fuels.  (See Pl. Ex. 25 and 26 ¶ 4)

Ray Perrin personally guaranteed the payment and obligations which were owed to Eagle Fuels under the agreements.  (See Pl. Ex. 25 and 26, Ex. B)  In addition, in order to induce Eagle Fuels to provide credit to the Buyer and to secure the payment and performance of the Buyer's obligations under the agreement, Ray Perrin also granted Eagle Fuels a security interest in the accounts, inventory, fixtures and equipment of Buyer as described in Exhibit C to the agreements.  Ray Perrin was also the landowner, and in that capacity he executed a separate landowner guaranty promising that he would require any new lessee or new owner to honor the fuel agreement.  (See Pl. Ex. 25 and 26, Landowner's Guaranty to Fuel Contract Between Millennium Super Stop, LLC and Eagle Fuels, LLC (Fuel Supplier))

Plaintiff claims the Perrin group[3] breached the contracts by failing to purchase fuel from Eagle Fuels as required by the contracts and by failing to offer Eagle Fuels a right of first refusal to lease the property.  Plaintiff seeks damages, specific performance of both contracts, a judgment against Ray Perrin on his personal guarantees, and foreclosure of the security interest as to both contracts.  (See Counts I through III, V and VI of plaintiff's Second Amended Complaint, doc. #47)  The Perrin group takes the position that a provision in each contract

---

[2]It was anticipated that one store would be a Conoco store and the other a Phillips store.  At the time, Conoco and Phillips were one company.  (Vol. I at 14)
[3]By Perrin group, the Court has reference to Ray Perrin, Ray Perrin d/b/a MSS, LLC and MSSII.

requiring that a $60,000.00 letter of credit or motor fuel surety bond to guarantee payment of fuel purchases was a pre-condition of the contracts. Ray Perrin claims he was unable to meet the condition of a fuel bond or letter of credit, and thus, the contracts "were never effected." (Doc. #178 at 8)

On June 7, 2010, two lease agreements were entered into between MSS, LLC, MSSII, LLC, 786 Enterprises, Inc. and Rawal Rock, Inc., wherein Ray Perrin leased to 786 Enterprises, Inc. and Rawal Rock, Inc., the two Millennium Super Stop stores which were the subject of the Eagle Fuels contracts with Ray Perrin d/b/a MSS, LLC. (See Pl. Ex. 29 and 30) The lease agreements did not require that either 786 Enterprises, Inc. or Rawal Rock, Inc. purchase fuel for these stores from Eagle Fuels.

Ray Perrin signed the lease agreements on behalf of MSS, LLC and MSSII, LLC. Asif Kiayani signed on behalf of 786 Enterprises, Inc. and Rawal Rock, Inc. (Pl. Ex. 29 and 30) Plaintiff contends that Asif Kiayani, Rawal Rock, Inc. and 786 Enterprises, Inc. knew of the contracts between plaintiff and the Perrin group and tortiously interfered with this relationship by entering into lease agreements which did not require the new lessees to purchase fuel from plaintiff. (See Counts VIII and IX of plaintiff's Second Amended Complaint, doc. #47) The Kiayani group[4] maintains that they could not have tortiously interfered with the Eagle Fuels contracts as Ray Perrin had already decided not to perform the Eagle Fuels contracts before Perrin's first contact with Kiayani. Kiayani claims that Ray Perrin was already in breach of the agreements with Eagle Fuels at the time of their first contact. (Doc. #179 at ¶¶ 17, 19)

## II. FINDINGS OF FACT

### A. Breach of Contract Claim

---

[4]By Kiayani group, the Court has reference to Asif Kiayani, 786 Enterprises, Inc. and Rawal Rock, Inc.

Ray Perrin had been the owner/operator of MSS and MSSII, convenience stores located at 3801 E. Truman Road, Kansas City, Missouri and 1601-1603 E. 12th Street, Kansas City, Missouri, respectively, since 2000. (Vol. II at 81)[5] The stores share space with a Wendy's restaurant and each store has sixteen gas pumps. (Vol. II at 81) During the time that Mr. Perrin operated these stores, he purchased petroleum products through a jobber as the number of his stores and volume did not allow him to purchase directly from the manufacturer. (Vol. II at 81) In 2009, Perrin's best jobber, Crescent Oil, went out of business. (Vol. II at 82) Perrin was buying gas from two smaller jobbers, but in 2009, his stores ran out of gas as the refineries did not allocate enough gas for unbranded stores.[6] (Vol. II at 82) In 2009, Mr. Perrin had particular difficulty getting weighted gas for the summer. He looked into Valero and Town and Country, but decided not to go with those companies as they were not saving him money. (Vol. II at 83) Taylor Oil, from whom he was buying gas in 2010, could not promise him seven pound gas in the summer. (Vol. II at 83) Thus, in 2010, Perrin was looking for a jobber that would sell him branded gas--which usually means Conoco/Phillips. Perrin's stores had previously been branded Conoco/Phillips so it was cheaper to go with them again.[7] (Vol. II at 82)

Prior to entering into the fuel agreements with Eagle Fuels, Ray Perrin's intent in the early Spring of 2010 was to sell or lease the stores to Ben Larsen who was going to contract with Eagle Fuels to supply fuel to the stores. (Vol. II at 82, 113) However, according to Perrin, that agreement fell through because of information obtained about Ben Larsen's solvency. (Vol. II at

[5]The Court had portions of the bench trial transcribed. Those transcripts are filed as Vol. I, doc. #155; Vol. II, doc. #156; and Vol. III, doc. #157.
[6]Branded gasoline would be associated with a label such as Conoco or Shell. Unbranded gasoline is bought on the open market and is not associated with any particular label. (Terry Addington, direct)
[7]The stores already had the red and white Conoco/Phillips color scheme and thus would be easy to rebrand. (Vol. II at 71)

113) Terry Addington testified that he first started talking to Ben Larsen several months before April 30, 2010. As Mr. Perrin was the landowner, copies of the agreements being proposed to Mr. Larsen were sent to Perrin. At some point, Perrin decided he would rather take the up-front[8] money and operate the stores. (Terry Addington, direct)

Martin Rivers is the owner of Eagle Fuels, Inc. and has been in the motor fuel business since April of 1980. (Vol. I at 7) He has owned stores, operated stores, leased them to operators and been a supplier of gasoline to stores in which he had no ownership interest. (Vol. I at 8) Mr. Rivers met Mr. Perrin one time. This meeting occurred during the time period when Ben Larsen was still considering leasing the stores. (Vol. I at 9)

The contracts sent to Ray Perrin for his signature contained the same terms as the contracts that had been sent to Ben Larsen, copies of which had also been sent to Ray Perrin, as the landowner, some months prior to April 30, 2010. (Terry Addington, direct) Mr. Addington brought Ray Perrin the contacts which are at issue in this case on or about April 30, 2010. They went over a couple of things connected to the contracts, and then Mr. Perrin signed them. (Vol. II at 85) Mr. Perrin testified he did not pay too much attention to them because he had seen such contracts before. He thought they were kind of boilerplate. (Vol. II at 85-86)

Ray Perrin indicated that because of Lasik surgery six or seven months earlier he had difficulty reading fine print. (Vol. II at 86) However, he acknowledged that he could read the contracts; but felt that such contracts were all about the same, and he could not do much about the terms as a fuel contract is a take it or leave it proposition. (Vol. II at 86) After Terry Addington brought back the contracts signed by Ray Perrin and gave them to Mr. Rivers, Rivers

---

[8]When a new customer is signed up, Conoco/Philllips estimates gallons per store and gives the wholesaler money which can be passed on to the retailer. (Terry Addington, direct)

signed them and then called Ray Perrin to thank him for the accounts.  In this call, Mr. Rivers indicated he would help Ray Perrin anyway he could.  (Vol. I at 15)

Each Fuel Agreement between Eagle Fuels and Ray Perrin, d/b/a MSS, LLC, contained the following provisions:

> This Agreement made and entered into this 30th day of April, 2010 (the "Effective Date") by and between Eagle Fuels, LLC, an Oklahoma Limited Liability Company, or it's assigns ("Seller") and Ray A. Perrin, DBA Millennium Super Stop, LLC, referred hereto as ("Buyer").
>
> ***
>
> 1.  **Term and Termination.**  The initial term of this Agreement shall begin on the Effective Date and continue for a period of <u>10</u> years with an option for an additional 5 years at Seller's discretion.
>
> ***
>
> 4.  **Purchase and Sale.**  Seller agrees to sell and deliver to Buyer, and Buyer agrees to purchase exclusively from Seller, all motor fuel products which Buyer requires or otherwise sells at the following Location(s) described and attached in Exhibit "A".  Unless otherwise agreed in writing, any purchases made by Buyer will be in a minimum quantity of eight thousand (8,500) (sic) gallons.
>
> ***
>
> 8.  **Credit and Payment Terms.**  Unless otherwise agreed in writing, Seller agrees to extend credit to Buyer for the motor fuel products purchased under this Agreement as follows: net seven (7) days from date of delivery or load-to-load, *whichever occurs first*.  **All payments shall be made by Buyer, by EFT drafts, to be initiated by Seller on or before the due date.  Draft notifications will be sent to Buyer by Seller at least one day prior to actual draft.**  If payment is not received on or before the due date, interest will be charged at the rate of eighteen percent (18%) per annum for each day which elapses from the due date to the date payment is received by Seller.
>
> **(a) A $60,000.00 letter of credit or motor fuel surety bond shall be required to guarantee payment for all fuel purchases.  Seller reserves the right to adjust or alter letter of credit at any time during the term of this agreement subject to fluctuation in fuel costs.**
>
> ***
>
> 12.  **Termination.**

**(a)** This Agreement may be terminated by Seller prior to the end of any term if:

**(b)** Buyer (or any guarantor of Buyer) makes any material false or misleading statement or representation which induces Seller to enter into this Agreement, or which is relevant to the relationship between the parties;

    **(i)** **Buyer becomes insolvent or bankrupt or a receiver is appointed for all or substantially all of the assets of Buyer;**

    **(ii)** Possession of Store Location is interrupted by an act of any government or agency thereof;

    **(iii)** Buyer defaults in any of its obligations under this Agreement (including any Exhibits to this Agreement) or any other agreement by and between Buyer and Seller or any affiliate of Seller;

    **(iv)** Buyer engages in fraud or criminal misconduct relevant to the operation of the business of the Buyer;

    **(v)** Withdrawal by ConocoPhillips from the market area;

    **(vi)** Seller's loss of the right to use the ConocoPhillips trademark;

    **(vii)** Failure to continuously operate the Store Location for seven consecutive days, or any shorter period of time which constitutes an unreasonable period of non-operation under the particular facts and circumstances;

    **(viii)** Buyer sells, gives or otherwise transfers control of all or substantially all of the common stock or assets of Buyer or the Store Location to a third party; or

**(c)** There occurs any other circumstance under which termination of a franchise is permitted under the provisions of the Petroleum Marketing Practices Act. By placing initials in the following blank, Buyer acknowledges that prior to entering into this Agreement, Seller provided Buyer with a Summary of Title 1 of the Petroleum Marketing Practices Act as amended. _____

**(d)** This Agreement may be terminated by Buyer if Seller fails to perform its obligations under this Agreement *and* fails to cure any such deficiency within thirty (30) days written notice is received from Buyer.

**(e)** Termination of this Agreement shall not prejudice the rights of either party to secure by appropriate action all benefits conferred by and performance due under the provisions of this Agreement.

**(f)** ConocoPhillips, Inc. and Eagle Fuels, LLC reserves their right under applicable enrollment and incentive agreements and the Wholesale Marketer Agreement to pursue all other available remedies, including lost profits, at their sole discretion. It is fully understood by and between all parties related to this agreement, that in the event, for any reason, contract obligations are not met under the ConocoPhillips incentive agreement and any incentives are "clawed-back" from Eagle Fuels, LLC, by ConocoPhillips, then Buyer(s) are fully liable for immediate repayment of said funds to Eagle Fuels, LLC.

***

14. **<u>Right of First Refusal.</u>** If Buyer receives a bona fide offer to buy, lease or trade all or any part of the Premises which Buyer desires to accept, Buyer shall immediately notify Seller of the terms and provisions of the offer, giving Seller a copy thereof, Seller shall have the prior exclusive option to buy or lease the Premises at the same price and on the same terms and conditions as contained in such offer. Seller shall have thirty (30) days from the receipt of notice to notify Buyer in writing if it elects to exercise this option. If Seller fails to notify Buyer within said thirty (30) day period, Seller shall be deemed to have elected not to exercise said option. If Seller does exercise said option, Buyer shall execute a Contract of Sale for the Premises or a lease for the premises within thirty (30) days thereafter, and the transaction shall be closed as soon as reasonably practicable. Seller's "first refusal" option shall run with the land and continue in force so long as Seller maintains a motor fuel supply relationship with Buyer.

***

15. **<u>Remedies.</u>** If an event of Default occurs that is not cured as provided for in this Agreement, the non-defaulting party shall have the right to terminate this Agreement and recover any damages it incurs, including a reasonable attorney's fees, as a result of the defaulting party's conduct.

The damages that Seller may recover include any unpaid invoices for motor fuel products sold or services rendered by Seller, damages related to Image Costs as set forth above, lost profits for unrealized fuel sales and transportation services for the balance of the initial term, and expenses incurred to de-brand the Store Location.

***

17. **<u>Personal Guaranty.</u>** (Check One)
_____Buyer is an individual.
__✔__Buyer is not an individual; therefore, a personal guaranty in the form of Exhibit B is required by Seller.

8

18.  **Grant of Security Interest.**  To secure the performance of all obligations due under this Agreement, Buyer agrees to execute the Security Agreement in the form of Exhibit C.

(Pl. Ex. 25 and 26)

Mr. Perrin was aware of the requirement in these contacts for a fuel bond or letter of credit, but was not worried about it as he had gotten fuel bonds before. (Vol. II 86-87) After signing the contracts, he asked Terry Addington when they could ship him a tanker and Mr. Addington said when we get the fuel bond.  (Vol. II at 87)  The fact that a fuel bond or letter of credit was a common practice in the industry was confirmed by Asif Kiayani who had owned or run convenience stores since 1995 or 1996 and who testified that off and on over the years he had a number of fuel bonds, but more often used letters of credit.  (Vol. III at 35)

Mr. Perrin had gotten a fuel bond in the past from State Farm.  He anticipated calling them and having them write the fuel bond.  (Vol. II at 87)  Shortly after entering into the fuel agreements with Eagle Fuels, Perrin called Eric from State Farm who was on vacation. Thus, he did not get ahold of Eric for about two weeks.[9]  (Vol. II at 87)   Eric told Perrin that State Farm did not write $60,000.00 fuel bonds, only $50,000.00 bonds, and that the company was thinking about getting out of the business. (Vol. II at 87-88)  Mr. Perrin thinks he gave Eric a verbal application over the phone, but indicated that State Farm quit writing fuel bonds so he could not get one from them. (Vol. II at 88)

Mr. Perrin indicated that he talked to Terry Addington almost every day for two or three weeks, sometimes two to three times a day.  (Vol. II at 92)  Although they were talking business generally, Mr. Perrin testified that in almost every conversation Perrin would tell Addington that

---

[9]This would mean that Mr. Perrin did not start talking to State Farm about a fuel bond until May 14, 2010.

he was having difficulty getting a fuel bond.  (Vol. II at 92-93)  According to Perrin, Addington told him he had to get a fuel bond, but that he knew a fuel bond company in Tulsa and that he could help him if that was needed.  (Vol. II at 93)  Mr. Perrin testified that one day, he called and asked Mr. Addington to help him get a fuel bond out of Tulsa.  Mr. Addington said he would see and Mr. Perrin never heard back from him. (Vol. II at 93)  Mr. Addington never offered to waive the fuel bond or letter of credit requirement or give Perrin some other option. (Vol. II at 94)

Terry Addington denied that between May 1 and June 10, 2010, Ray Perrin ever indicated there was a problem getting a letter of credit or fuel bond. (Terry Addington, direct) Larry Griffin, General Manager of Eagle Fuels at the time, sent an e-mail to Ray Perrin on May 10, 2010, as follows:

> Good Morning, Ray, just wanted to touch base with you to ask if you have heard anything on the fuel bonds.  Please let me know if the underwriter has any questions as to format or any other issue that we might need to answer to complete the process.  Have a great day!

(Pl. Ex. 38)  Mr. Perrin did not reply to this e-mail.  No one from the Perrin group ever called Mr. Griffin to say that they could not get a fuel bond, and there was no request made for a waiver or modification of the letter of credit requirement. (Larry Griffin, direct) After the conversation where he thanked Mr. Perrin for his business, Mr. Rivers did not talk to Mr. Perrin again and Perrin never called nor e-mailed Rivers to indicate that Perrin was having trouble with any issue. (Vol. I at 19)

With respect to the efforts made to obtain a fuel bond or letter of credit, Mr. Perrin testified that there came a time when he determined he was not going to be able to get a fuel bond or letter of credit. (Vol. II at 97)  This occurred when all of his banking contacts had said that because of the economy, they were not writing letters of credit and when State Farm said they would not write fuel bonds anymore. (Vol. II at 97)  According to Mr. Perrin, Mike Holmes,

who worked with Perrin on other projects, was asked to go out and find bankers who would give Perrin a letter of credit. (Vol. II at 97-98)  Ray Perrin testified that Mr. Holmes contacted everyone he knew and then told Mr. Perrin that he was not getting any results as far as a letter of credit. (Vol.II at 97-98)  Mike Holmes, an independent contractor with Aaron Group, testified to his efforts to obtain a fuel bond or letter of credit for Ray Perrin; however, he also acknowledged he never made any applications nor filled out any paperwork for either a fuel bond or letter of credit.  (Mike Holmes, direct and cross)  In a memo prepared one year later at the request of Mr. Perrin's counsel, Mr. Holmes noted that they would need either a "high premium bond or provide cash and securities to secure a LETTER OF CREDIT that would have been far in excess of cost of fuel." (Def. Ex. 1)  Mr. Perrin also testified that he did not apply for a letter of credit with Central Bank, the bank he normally did business with, nor did he ask them to run his credit. (Vol. II at 154)

Mr. Rivers testified that if customers needed to modify the fuel bond portion of their contract, Eagle Fuels would do so.  (Vol. I at 16-18)  One of the reasons that Eagle Fuels is willing to make modifications to this provision when necessary is that a substantial amount of sales were by customers using credit cards.  (Vol. I at 34)  Mr. Rivers would have expected credit card sales at these stores to be higher than 50 percent.  (Vol. I at 34)  When someone uses a credit card, Phillips or any other bank card, at the pumps or in the store, the money goes from Conoco/Phillips to an account in the name of Eagle Fuels.  Eagle Fuels has the credit which is passed on to the operator.  (Vol. I at 31-33)  The fact that Conoco/Phillips and Eagle Fuels have control over the allocation of money from credit card sales provides some protection that the

Seller will receive payment for the fuel and may allow a Seller, upon request, to modify or reduce the fuel bond/letter of credit requirement.[10]

There was conflicting testimony presented from all parties concerning whether incentive money that Conoco/Phillips 66 was providing Ray Perrin as the operator of MSS and MSSII could have been used as collateral for the fuel bond. Whether all or a portion of the incentive money could have been used to provide collateral for a letter of credit is irrelevant to the issues before the Court. Although Mr. Perrin testified that his tax returns showed that MSS and MSSII were losing money, he was involved in other businesses including rental property, three bars and an asbestos abatement company. (Vol. II at 120-22, 157) Mr. Perrin had personally guaranteed the agreements which he understood to mean that if the business did not pay, he would. (Vol. II at 159) He understood that a letter of credit had to be 100 percent collateralized. (Vol. II at 158) Setting aside the incentive money, Mr. Perrin testified that in 2010 he had collateral of $120,000.00. (Vol. II at 158) He further acknowledged that if he had needed to pledge assets to secure a $120,000.00 line or letter of credit, he could have done so. (Vol. II at 158-59)

Mr. Perrin indicated that at the time he signed the contracts, he did not think he knew that he would be paying one cent per gallon over Eagle Fuels' wholesale price or rack price. (Vol. II at 88)[11] At some point, Mr. Perrin testified that he called Mr. Addington and asked him about it, and Mr. Addington said he would rather have the money in his pocket than in Mr. Perrin's. (Vol. II at 88) Although he denied that this would keep him from going forward with the contract with

---

[10]These facts suggest that if the fuel bond or letter of credit had really been the stumbling block to proceeding with the contracts, Mr. Perrin would have asked for the bond amount to be lowered.

[11]Section 6 of the Retail Product Sales Agreement clearly sets forth the price that the Perrin group would be paying for the fuel.

Eagle Fuels, Mr. Perrin thought that Eagle Fuels should have wanted him to have this money, the one cent per gallon over Eagle Fuels' wholesale price. (Vol II at 88-89)

Mr. Perrin testified that he called Terry Addington and asked what it would take to buy out the contract. (Vol. II at 149) In that call, Mr. Perrin never told Mr. Addington that he did not think the contracts were effective, or that they were illusory or executory because he could not get a bond. (Vol. II at 149) Similarly, Mr. Addington testified that Mr. Perrin made a call to him to ask what it would take to buy back the contracts. Mr. Addington told him probably around $400,000.00 to $500,000.00, but that he would have to check with Mr. Rivers. Mr. Addington thought that Mr. Perrin wanted to offer around $10,000.00. Mr. Addington confirmed that in that call, Mr. Perrin did not say he could not get a letter of credit. (Terry Addington, direct) Nor did Mr. Perrin indicate he would not be honoring the contracts. (Terry Addington, direct)

B.    Tortious Interference Claim

Mr. Perrin testified that he signed lease contracts with Mr. Kiayani for the two stations, MSS and MSSII, on June 7, 2010. (Vol. II at 110, Pl. Ex. 29 and 30) However, he testified that his involvement with Mr. Kiayani had nothing to do with Eagle Fuels and that he never knew Mr. Kiayani until the last week of May, later than May 25 and closer to May 30. (Vol. II at 110, 143) At the time of his testimony, Mr. Kiayani operated fourteen plus retail service stations in the Kansas City metro area. (Vol. III at 6-7) The majority of his stores were branded Conoco/Phillips. (Vol. III at 15) During the time period in question, Mr. Kiayani operated a convenience store and gas station on Truman Road, within sight of MSS, which was branded Conoco. (Vol. I at 13)

Asif Kiayani approached Ray Perrin about leasing his stores because he heard through his vendors that the stores were for sale or lease. They had been on the market for a year. (Vol. III

at 6-7)  Mr. Kiayani contacted Mr. Perrin about leasing the stations in May of 2010, because he concluded his financial situation then would allow him to afford it. (Vol. III at 7)  However, shortly after the Eagle Fuels contracts were signed, Mr. Perrin had canvas signs put over the stations high rise signs indicating Conoco or Phillips coming soon.  (Vol. II at 89-90)  Mr. Kiayani testified that when he was talking to Ray Perrin, Mr. Perrin told him he had an agreement with Eagle Fuels, but that he could not perform the agreement because he could not get a bond.  (Vol. III at 23)  Mr. Kiayani said his attorney advised him that he did not have an agreement with Eagle Fuels. (Vol. III at 23)  Mr. Kiayani does not remember asking Mr. Perrin if he (Kiayani) had to buy fuel from Eagle Fuels. (Vol. III at 23) However, Mr. Kiayani was familiar with the concept that fuel agreements frequently require that if someone else comes in and operates the store, they have to be bound by the agreement as well. (Vol. III at 51)   In fact, Mr. Kiayani had previously been sued by Lion Petroleum with respect to a fuel agreement entered into in May of 2009 for the Truman Road location, in part, for allegedly purchasing fuel from other suppliers in violation of his contract with Lion.  (Pl. Ex. 40)

Mr. Perrin gave Mr. Kiayani and the realtor who was with him copies of the Eagle Fuels agreements, but probably not the first time they met. (Vol. II at 144)  Between May 30 and June 7, 2010, Mr. Perrin met several times with Mr. Kiayani and gave him copies of the Eagle Fuels agreements. Mr. Perrin also asked his lawyer to prepare lease agreements to present to Mr. Kiayani.  (Vol. II at 148)  Mr. Kiayani denied ever telling Ray Perrin he would offer him a better deal or that Perrin should not continue his agreements with Eagle Fuels.  (Vol. III at 23)

Despite Ray Perrin's initial testimony on direct that he did not have discussions with Mr. Kiayani until late May, after he had already determined that he could not get a fuel bond, the testimony and evidence suggests that Mr. Perrin began having discussions with Mr. Kiayani

much earlier in May. Mr. Perrin acknowledged that it took several days for his lawyer to draft the lease agreements, then he would have sent them to Mr. Kiayani who would have forwarded them to his attorney. (Vol. II at 179) Mr. Perrin also indicated that it was a couple of weeks after that before Mr. Perrin heard back because "Kiayani's attorney had to look at them and Kiayani is a busy man." (Vol. II at 179) On re-cross, Mr. Perrin acknowledged that for all of the meeting and contract reviews to have been completed by June 7, 2010, he probably first met with Mr. Kiayani at a date earlier in May than what he first testified to on direct. (Vol. II at 180)

Mr. Kiayani testified on direct that he first had conversations with Ray Perrin about the lease of the stations around the end of May or maybe the middle of May. (Vol. III at 3) However, in his prior deposition testimony, Mr. Kiayani indicated that he first met with Mr. Perrin about a month before the leases were signed or early to mid-May. (Vol. III at 28-29) Mr. Kiayani met with Mr. Perrin six or seven times before the leases were signed. (Vol. III at 38) Mr. Kiayani testified that Ray Perrin never gave him the Eagle Fuels contracts, but Perrin did mention them, and Kiayani told Perrin to send copies of the Eagle Fuels contracts to his attorney. (Vol. II at 30)

According to Mr. Rivers, the MSS on Truman Road is right off the interstate and in a better location than Mr. Kiayani's store. (Vol. I at 22-23) Based on his experience, Mr. Rivers was of the opinion that branding a store the same brand as Mr. Kiayani's store that close to Kiayani's store would have pulled business from Kiayani and would have eroded his overall margin. (Vol. I at 24) Mr. Rivers was of this opinion because anytime stores are the same brand of gasoline, you are sharing a pool of business. (Vol. I at 23) Mr. Rivers explained that branding a store that close to Mr. Kiayani's store would hurt Kiayani more if the branding was done by different people. However, if the same person controlled both stores, they could decide

how to price the fuel for both stores rather than fighting with a third party over pricing. (Vol.. II at 65)

The Court concludes that the evidence establishes that probably four weeks prior to June 7, 2010, and at the very latest by May 15, 2010, Mr. Perrin and Mr. Kiayani were discussing the lease of the stores by the Kiayani group. This evidence further supports the Court's conclusion that Mr. Perrin's decision not to go forward with the Eagle Fuels contracts was unrelated to the issue of a fuel bond/letter of credit and instead was the result of Perrin deciding to go forward with the leases offered by the Kiayani group rather than continuing to operate the stores himself pursuant to the Eagle Fuels' agreements.

In making the findings of fact required to decide the issues raised by the parties, the Court has examined the testimony of the witnesses and considered their appearance, attitude, and behavior as well as their interest in the litigation and the relationship of the witnesses to the parties. The Court has also considered the probability or improbability of their statements, particularly in light of the written documents and exhibits. Each side has raised credibility issues as to the others' witnesses. For example, it has been pointed out that Martin Rivers is a convicted felon. Mr. Addington was less than forthcoming concerning his son's involvement in Patriot Fuels, a predecessor to Eagle Fuels, as well as the reasons he was willing to help Eagle Fuels grow their business. Mr. Holmes, the person assisting Mr. Perrin in obtaining a letter of credit, had been fined and lost his securities license at various times. Mr. Perrin's and Mr. Kiayani's reliability was questioned given that their testimony concerning key dates changed between the time of their depositions and trial.

However, one fact not mentioned by any of the parties is that all of the key individuals involved in the negotiations of the Eagle Fuels contracts and the Kiayani leases were experienced

with how fuel is purchased and sold to convenience stores such as MSS and MSSII, as well as the standard industry requirements in contracts for branded fuel purchases. Mr. Perrin's stores had been debranded by Conoco/Philips as the result of earlier litigation with a fuel supplier. Mr. Kiayani had previously been in litigation with a fuel supplier who alleged that he had entered into written contracts agreeing to purchase fuel from Lion Petroleum for a ten-year period and that Mr. Kiayani, as well as 786 Enterprises, Inc. and Rawal Rock, Inc. and others, had breached these agreements. (See Pl. Ex. 40) While the Court has accepted some, but not all of each witness' testimony, the testimony offered by Eagle Fuels on direct and through cross-examination of defendants establishes a time line more consistent with plaintiff's position than that of defendants.

## III. CONCLUSIONS OF LAW

### A. Breach of Contract

In Missouri, a party alleging breach of contract claim must prove: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff. See Keveney v. Missouri Military Acad., 304 S.W.3d 98, 104 (Mo. en banc 2010)(citing Howe v. ALD Servs., Inc. 941 S.W.2d 645, 650 (Mo. Ct. App. 1997)).

It was undisputed that fuel contracts were entered into between Eagle Fuels and Ray Perrin, d/b/a MSS, wherein Ray Perrin was to buy fuel for two convenience stores which he owned and Eagle Fuels was to sell the fuel. In the proposed findings of fact and conclusions of law submitted by the Perrin group, subheading B states "the Eagle Fuels Agreements with Perrin were illusory and unenforceable." (Doc. #178 at 2) Defendants cite no case law in support of this finding, but refer to the Branded Marketer Agreement between Eagle Fuels and

Conoco/Phillips, and sections 7 (Transportation Charges and Terms of Delivery) and 12 (Termination) of the Eagle Fuels/Ray Perrin contracts. To the extent the Perrin group is arguing that the right of Eagle Fuels to supply Conoco/Phillips gasoline was transferred to Empire Petroleum, the Court previously dealt with this issue in its Order of February 20, 2014 (doc. #177). Accordingly, despite Perrin's claim that the contract was illusory, the Court finds there was a contract between Eagle Fuels and Ray Perrin, d/b/a MSS, LLC.

Next, there must be evidence that plaintiff performed or tendered performance under the terms of the contract. During the negotiation of the contracts and prior to their signing, representatives of Eagle Fuels began having contact with representatives of Conoco/Phillips to work out the details of a program brand proposal for the two stores. These discussions are memorialized in a series of e-mails. (See Pl. Ex. 37) Representatives of Conoco were advised that the proposed operator wanted as much up-front money as possible, a ten-year contract and $15,000.00 per store for interstate sign upgrades. (Pl. Ex. 37, e-mail dated April 12, 2010 from Larry Griffin to Robert Tharp of Conoco) Mr. Rivers had some difficulty convincing Conoco/Phillips to agree to brand the stores owned by Ray Perrin. These stores had previously been branded Conoco/Phillips, but the brand had been pulled because of litigation between Ray Perrin and Lion Oil Company. (Vol. I at 10) It took Mr. Rivers two to three weeks to convince Conoco/Phillips to rebrand the stores. (Vol. I at 11)

By April 29, 2010, Marty Rivers was advised by Robert Tharp of Conoco that he had approval for the revised offer pertaining to the Millennium stores. Mr. Rivers was asked to complete the necessary form so that the CSU could issue. (Pl. Ex. 37, e-mail from Robert Tharp to Marty Rivers dated April 29, 2010) The CSU (Customer Service Updates) were issued by Conoco and signed by Mr. Rivers on May 3, 2010. These documents reflect that $77,700.00

would be provided in up-front funds to each store as of June 1, 2010. (Pl. Ex. 31) Mr. Rivers indicated that this money was sent to them and placed in an account to be forwarded to Ray Perrin. When Ray Perrin did not perform the contracts, the money was ultimately returned to Conoco.

Immediately after the signing of the Eagle Fuels agreements, Larry Griffin was working with a carrier to make arrangements for transporting gas once it was ordered by Ray Perrin. (Larry Griffin, direct) However, no gas was ever delivered as no order was ever placed. Mr. Griffin also reviewed a copy of the signage contract relating to the rebranding of the store. (See Pl. Ex. 34) Marty Rivers testified that although Ray Perrin had asked Terry Addington about buying his way out of the contract, he did not indicate he would not perform under the contract. Thus, in July, Mr. Rivers asked his attorney to send a letter advising Ray Perrin that he was in breach for purchasing fuel from sources other than Eagle Fuels and asking Ray Perrin to adhere to the terms of the contract. (See Def. Ex. 6; Vol. I at 26) There was no response to that letter. (Vol. I at 26) When asked on cross-examination why he did not contact Mr. Perrin to try and work out their issues, Mr. Rivers indicated that he called Mr. Perrin several times before the letter was sent by his attorney, but Mr. Perrin did not call him back. (Vol. I at 40) Mr. Rivers thinks he tried to contact Mr. Perrin six or seven times. (Vol. I at 42) The Court finds that these actions show that plaintiff was ready to perform and tendered performance to the Perrin group.

The real issue before the Court involves the third element of a contract claim, that is whether there was a breach of the contract by Ray Perrin, d/b/a MSS, LLC. The Perrin group disputes that their failure to perform under the agreement is actionable. They maintain that the entire agreement was premised on Ray Perrin obtaining a fuel bond or letter of credit, a

requirement they contend was a "pre-condition of the contract."[12]  (See subsection C, doc. #178 at 3-7)  Whether fuel bonds/letters of credit were more difficult or more expensive to obtain in 2010 than previously, as suggested by some of the testimony, is not the issue before the Court. The Perrin group has contended they could not get a fuel bond or letter of credit.  However, the testimony indicates that Mr. Perrin never filled out any paperwork or application for a fuel bond or letter of credit with any bank or broker despite his admission that he personally had sufficient assets to fully collateralize a $120,000.00 letter of credit.

That he recognized at the time that he had a binding contract with Eagle Fuels is demonstrated by the testimony of both Ray Perrin and Terry Addington concerning a call made by Mr. Perrin to Mr. Addington asking what it would take to buy out the contracts.  In that call, Mr. Perrin never told Mr. Addington that he did not think the contracts were effective, or that they were illusory or executory because he could not get a fuel bond.  (Vol. II at 149)

Having considered all of the evidence, the Court concludes that the evidence and reasonable inferences therefrom establish that Ray Perrin elected not to carry out the terms of the contracts with Eagle Fuels because a better deal was offered by Asif Kiayani and not because he could not get a fuel bond or letter of credit.  The Court has examined the testimony of each of the witnesses for consistency and to determine how the testimony fits with the written documents and exhibits as well as the time frame at issue, that is May 1 through June 7, 2010.

It is undisputed that after signing contracts with Eagle Fuels on May 1, 2010, Ray Perrin negotiated leases for the same property with the Kiayani group and that these documents were

---

[12]Defendants suggest that in denying plaintiff's motion for partial summary judgment, doc. #119, the Court has already determined that the fuel bond requirement was a pre-condition of the contract.  However, the Court's earlier ruling was based on certain uncontroverted facts presented for purposes of the summary judgment motion.  At trial, there was testimony directly contrary to many of the allegedly uncontroverted summary judgment facts.  Thus, this prior ruling cannot be the basis of the Court's decision following trial.

signed on June 7, 2010. Prior to their signing, Ray Perrin had six to seven meetings with Asif Kiayani, had his counsel draft the lease agreements, and allowed Kiayani and his attorney to review the documents for as long as a two-week period. During that time period, Ray Perrin also raised issues as to why, as the operator, he would not be given the one cent above wholesale incentive and subsequently asked how he could buy his way out of the contracts. The facts as found by the Court support the conclusion that there was a valid fuel agreement which was breached by Mr. Perrin and that Eagle Fuels was thereby damaged.

B.    Tortious Interference With a Contract

A claim for tortious interference with a contract or business expectancy requires proof of each of the following: (1) a contract or business expectancy; (2) the defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and (5) damages resulting from the defendant's conduct. See Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n, 796 S.W.2d 369, 372 (Mo. en banc 1990).

The first two elements--a contract and Asif Kiayani's knowledge of that contract are not in dispute. Defendant Kiayani claims that plaintiff cannot meet its burden of proof to demonstrate that the defendant caused the breach or that there was an absence of justification. As to the third element of a tortious interference claim, that the defendant induced or caused the breach, defendant Kiayani argues that defendant's acts must be a moving cause of the breach. Further, the rule supposes that the party defaulting was ready, able and willing to perform and would have done so if it had not been prevented or persuaded by the interference of a third party. (Doc. #179 at 4) In Missouri, courts attempting to determine if a party "caused" another to breach a contract apply a "but-for" test. Under this test, the inquiry is "(1) did [the defendant]

actively and affirmatively take steps to induce the breach; and if so, (2) would the contracts have been performed absent [defendant's] interference." Tamko Roofing Prods., Inc. v. Smith Eng'g Co., 450 F.3d 822, 830 (8th Cir. 2006).

Defendant Kiayani claims he did not cause Ray Perrin to breach the fuel agreements with Eagle Fuels as Perrin had already decided not to perform the Eagle Fuels contracts and was already in breach of the contracts before Kiayani ever talked to him. (Doc. #179 at 3) As evidence for this, Kiayani argues that Perrin ordered fuel from other vendors before June 7, 2010 (the date of the Kiayani contracts) and between June 7, 2010 and August 1, 2010, the date the Kiayani leases went into effect. (Doc. #179 at 3)

In the Court's view, the evidence and the reasonable inferences that can be drawn from the evidence suggest the following. Mr. Kiayani had known for some time that Mr. Perrin was trying to lease or sell his stores. However, Mr. Kiayani did not approach Mr. Perrin until early to mid-May 2010. Mr. Kiayani indicated that he approached Mr. Perrin in this time frame as his financial situation allowed him to do that at that time. However, shortly after Mr. Perrin signed the contracts with Eagle Fuels, he put up banners on his stores announcing Conoco/Phillips coming soon. (Vol. II at 89-90) Thus, at the time Mr. Kiayani approached Mr. Perrin, which for reasons previously discussed was somewhere between May 10 and May 15, Mr. Kiayani would have known that the station was going to become a branded station--the same brand as his nearby station on Truman Road.

While Mr. Perrin claims that his inability to obtain a fuel bond/letter of credit was what caused him to abandon the Eagle Fuels contracts, the Court has also previously discussed why this claim is not supported by the evidence. Mr. Perrin states he did not even reach Eric of State Farm until two weeks after signing the contract, he did not seek any other companies to provide a

fuel bond, and he had sufficient funds to obtain a letter of credit. Although Mr. Perrin claims

that letters of credit were not available, even the individual who was tasked with assisting in that

process, in a memo prepared a year later, indicated that there were fuel bonds or letters of credit

available, but with a high premium or significant collateral requirement. Further, Mr. Perrin

never contacted the President of Eagle Fuels about the bond situation, did not respond to Mr.

Griffin's offer of assistance and crediting Terry Addington's testimony never advised him of the

difficulty he was having in obtaining a bond. When Ray Perrin called to find out if he could buy

back the contracts, he never indicated the reason he wanted to buy them back was that he could

not get a fuel bond or letter of credit.

When contacted by Eagle Fuels' counsel, Mr. Perrin did not respond to the demand that

he purchase fuel from Eagle Fuels. The only significant development during this time period

was Mr. Kiayani's offer to lease the stores--which clearly came after the Eagle Fuels contracts

had been signed. The court concludes that but for Mr. Kiayani's offer to lease the stores, Mr.

Perrin would have performed under the terms of the Eagle Fuels' contracts.

The next element that must be established for a claim of tortious interference is the

absence of justification. The Kiayani group maintains that a party may be justified where it has a

legal right to interfere with a contract so long as the defendant does not employ improper means

in causing the interference. Further, the Kiayani group claims that protecting one's economic

interests constitutes a justification for interference with a contract. (Doc. #179 at 4-5) However,

the cases cited by defendants for these legal claims involve significantly different factual

circumstances.

For example, in <u>Alternative Fuels, Inc. v. Cabanas</u>, 435 F.3d 855 (8th Cir. 2006), the issue

was whether a state mine inspector had an absolute privilege for comments made to two

companies who had entered into a contract for one company to buy and the other to sell slurry. The inspector advised the parties that the sale of slurry would require a permit change which would not happen while he was an inspector. The appellate court affirmed the trial court's denial of summary judgment to the mine inspector on the tortious interference claim for the reason that the mine inspector was not acting within the scope of his official duties, and thus, did not have an absolute privilege for making a false statement. Id. at 859.

In Kerr Construction Paving Co. v. Khazin, 961 S.W.2d 75 (Mo. Ct. App. 1997), a paving company sued a Missouri Department of Transportation inspector and his supervisor for tortious interference with a contract between the company and the City of Independence. A jury verdict in favor of the paving company on the tortious interference claim was upheld on appeal. In discussing the issue of economic interest, the appellate court "assumed" for purposes of the discussion that the employees of the Missouri Department of Transportation had an economic interest to protect and focused the inquiry on the misrepresentations made by the employees which the court concluded were an improper means of protecting an economic interest. Id. at 80-81. However, in Kerr, the "assumed" economic interest was that the Missouri Department of Transportation (MODOT) had agreed to use grant money to reimburse the City for the work which Kerr Construction was doing pursuant to the contract with the City. Thus, MODOT had been given the right to have inspectors approve the work being done by Kerr.

In another case cited by defendant Kiayani, American Cable Technologies Services, Inc. v. AT&T Corp., 140 F.Supp.2d 1026 (W.D. Mo. 2001), the court found that AT&T had an economic interest in its fiber optic cable. Thus, notifying Southwestern Bell Telephone Company that one of its contractors had nearly missed damaging the AT&T cable was not an unjustifiable interference in the contractual relation between Southwestern Bell Telephone

Company and its contractor.  Id. at 1032-33.  In all of the cases cited by the Kiayani group, the "economic interest" was something more than the interest of a competitor in maximizing his profit.

At the time Asif Kiayani approached Ray Perrin about leasing his stores, Mr. Kiayani had no protectable economic interest in the stores or how they were performing.  His economic interest was only as a competitor of Ray Perrin.  The court in Briner Electric Co. v. Sachs Electric Co., 680 S.W.2d 737, 741 (Mo. Ct. App. 1984), addressed the issue of when competition justifies an intentional interference with another's business relationships, and adopted the Restatement (Second) of Torts § 768 (1979) as accurately reflecting Missouri law.  That section provides:

> Competition as Proper or Improper Interference (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
>> (a) the relation concerns a matter involved in the competition between the actor and the other and
>>
>> (b) the actor does not employ wrongful means and
>>
>> (c) his action does not create or continue an unlawful restraint of trade and
>>
>> (d) his purpose is at least in part to advance his interest in competing with the other.
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Briner Electric Co., 680 S.W.2d at 741.

The Kiayani group emphasizes that they did not employ any improper means such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or other wrongful act in furthering their economic interests.  However, the Restatement (Second) is clear that the

interference by a competitor may be proper only in situations in which a party is caused not to enter into a **prospective** contractual relationship or to terminate an existing contract which is **terminable at will**. Here, Mr. Kiayani did not have an economic interest in the stations owned and operated by Ray Perrin, but was in competition with him. Significantly, the Eagle Fuels contracts were not prospective possibilities nor terminable at will. The Court has found no cases authorizing interference by a competitor in a signed contractual agreement in this situation. The fact that Mr. Kiayani did not use threats or misrepresentations to induce the breach is immaterial in these circumstances. The Court finds that he "caused" Mr. Perrin's non-performance and that his actions were without justification. Accordingly, defendant Asif Kiayani, 786 Enterprises, Inc. and Rawal Rock, Inc. are liable for the plaintiff's damages as well.

## IV. CONCLUSION

In a breach of contract action, a plaintiff may recover the benefit of the bargain as well as damages naturally and proximately caused by the breach and damages that could have been reasonably contemplated by the defendant at the time of the agreement. See Williams Constr., Inc. v. Wehr Constr., LLC, 403 S.W.3d 660, 666 (Mo. Ct. App. 2012). When the breach of contract consists of prevention of performance, the party not in default may generally recover the profits which would have resulted from performance. See BMK Corp. v. Clayton Corp., 226 S.W. 3d 179, 195 (Mo. Ct. App. 2007).

Both Terry Addington and Marty Rivers testified concerning the damages sustained by Eagle Fuels. Plaintiff's Exhibit 36 sets forth total damages of $3,004,333.33 and the underlying calculations. Marty Rivers indicated that Plaintiff's Exhibit 36 accurately reflects Eagle Fuels' losses on the contracts. (Vol. I at 36) Terry Addington also testified concerning Plaintiff's Exhibit 36 indicating that he provided the information that is contained in the exhibit. (Terry

Addington, direct)  The contract term utilized for plaintiff's calculations in Exhibit 36 was 180 months or fifteen years.  This assumed that the Seller would renew the contract at the end of ten years for another five-year term.  No evidence was presented by any party concerning the likelihood of the contract being renewed at the end of the initial ten-year period.  In fact, by the time of trial, Eagle Fuels had sold its fuel contracts to Empire.  (Vol. I at 8)  Since that sellout, Eagle Fuels has not sold fuel or entered into motor fuel contracts.  (Vol. I at 9)

The transfer of the Eagle Fuels' contracts to Empire was the subject of defendants' motion for relief from proceedings and for judgment.  (Doc. #158)  While the Court's Order concluded that MSS and MSSII were not intended to be part of this transfer, the Court assumes this may have been so that the pending litigation could be concluded with Eagle Fuels as the plaintiff, rather than a substitute party.  However, no evidence has been presented to suggest that if Ray Perrin had honored the fuel agreements for the Millennium stores, they would have been excepted from the transfer to Empire or that Eagle Fuels would have continued to supply these stores with fuel after October 2, 2012, the effective date of the transfer agreement with Empire.  Mr. Rivers testified that Eagle Fuels got out of the business of supplying fuel or entering into motor fuel agreements after the sellout.  (Vol. I at 9)  Accordingly, for purposes of damages, the Court will assume that the parties would have continued to operate under the fuel agreements for 28 months rather than the 180 months used by plaintiff in the loss calculations.

The Court has arrived at a 28-month time period by assuming that the fuel bond or letter of credit would have been in place so that gas could be delivered by June 1, 2010.  The transfer of the fuel contracts to Empire was effective as of October 2, 2012.  Thus, damages have been calculated on the 28-month time period from June 1, 2010 to October 1, 2012.  Using the formula set out by plaintiff, which formula is based on provisions in the contract and the number

of gallons of gasoline estimated to be sold each month given the stores' past performance, the Court calculates plaintiff's damages at $382,200.00, rather than the $3,004,333.33 sought by plaintiff. This figure was arrived at as follows: the margin lost on gasoline $103,600.00 (185,000 gallons per month x 28 months x 2 stores x .01 contracted margin); the margin lost on diesel fuel $5,600.00 (10,000 gallons per month x 28 months x 2 stores x .01 contracted margin); and the timely payment discount $273,000.00 (195,000 gallons total fuel per month x 28 months x 2 stores x .0250 discount).

The Court declines to award any damages for the posting of a Missouri fuel bond. It is unclear if Eagle Fuels did other business in Missouri which would have required the posting of this bond, and if not, whether this bond continued to be posted after Mr. Perrin breached the agreement. As to the $1,500.00 per month that Eagle Fuels contends it would have received if it had been allowed to lease the property, and in turn subleased it, the Court concludes this is speculative. The fuel agreements did provide that before Mr. Perrin could lease the property, he had to offer the lease opportunity to Eagle Fuels, under a right of first refusal clause. However, there was no testimony that in the absence of the tortious interference by Asif Kiayani, 786 Enterprises, Inc. and Rawal Rock, Inc., Mr. Perrin would have leased the property to someone else, that Eagle Fuels would have then exercised its rights and leased the property only to sublease it on such terms that an additional $1,500.00 per month in income would have been generated for Eagle Fuels. For these reasons, the Court finds that the lost profits due to the breach of contract amount to $382,200.00.

Plaintiff claims that its lost profits are the damages sustained both from the breach of the contract by Ray Perrin, d/b/a Millennium Super Stop, LLC, and the tortious interference with the contract by Asif Kiayani and his companies. Accordingly, it is

ORDERED that the Court finds in favor of plaintiff against Ray Perrin, d/b/a Millennium Super Stop, LLC, Ray Perrin, Asif Kiayani, 786 Enterprises, Inc. and Rawal Rock, Inc. and awards damages in the total amount of $382,200.00 from these defendants.  It is further

ORDERED that plaintiff is given 21 days in which to submit a claim for attorney fees as allowed by section 15 of the Retailer Product Sales Agreements entered into between Eagle Fuels and Ray Perrin, d/b/a Millennium Super Stop, LLC.


_____*/s/ Sarah W. Hays*_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE